**Bradley ENGLEBRICK; Roxanne Hernandez, Plaintiffs,**

v.

**WORTHINGTON INDUSTRIES, INC., et al., Defendants.**

Case No. 8:08–cv–01296–CJC(MLGx).

United States District Court,
C.D. California,
Southern Division.

May 13, 2013.

Jason M. Caruso, Troy Gabriel Houston, Kevin George Liebeck, Jeffrey A. Milman, Hodes, Milman, Liebeck, Mosier LLP, Irvine, CA, John Rapillo, Law Offices of John Rapillo, Newport Beach, CA, for Plaintiff.

Richard Allen Ergo, Cathleen S. Huang, William T. Nagle, Bowles and Verna, Walnut Creek, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

CORMAC J. CARNEY, District Judge.

### I. INTRODUCTION

Plaintiffs Bradley Englebrick and Roxanne Hernandez ("Plaintiffs") brought this products liability action against Defendants Worthington Industries, Inc. ("WII")

and Worthington Cylinders Wisconsin, LLC ("WCW") (together, "Worthington"), asserting that they suffered severe burns and other physical and emotional injuries after an allegedly defective MAPP gas cylinder (the "Cylinder") designed, manufactured, sold, and distributed by Worthington leaked gas and burst into flames.[1] Mr. Englebrick suffered severe burns in the resulting fire, and Ms. Hernandez sustained injuries when she jumped out a window to escape the fire. Worthington maintains that Plaintiffs' negligence and abuse of the Cylinder, connected to their use of methamphetamine ("meth"), was the actual cause of the fire. Following more than four years of litigation, the Court began a bench trial on February 12, 2013. At trial, Plaintiffs admitted to testifying falsely regarding their history of meth use at their depositions and in a response to a request for admission. Before the Court is Worthington's motion to dismiss the entire action based on Plaintiffs' false deposition testimony and discovery response. Because Plaintiffs' repeated lies about their meth use and addiction have compromised the integrity of the legal proceedings and prejudiced Worthington, the Court GRANTS Worthington's motion to dismiss.

## II. BACKGROUND

Plaintiffs filed the operative Second Amended Complaint ("SAC") on July 6, 2011. (Dkt. No. 292.) In the SAC, Plaintiffs allege that Worthington "designed, tested, manufactured, marketed, sold, distributed, supplied, wholesaled, and retailed" the Cylinder. (SAC ¶ 7.) The Cylinder was meant to be fitted with a torch tip, which ignites when it is affixed to a MAPP gas cylinder. (Id. ¶ 14) Plaintiffs allege that Mr. Englebrick purchased the Cylinder on Thursday, April 3, 2008 from a Lowe's store. (Id.) On Monday, April 7, 2008, Mr. Englebrick took the Cylinder and torch tip into the apartment he shared with Ms. Hernandez. (Id. ¶ 16.) Plaintiffs allege that the Cylinder had a leak at its neck, which caused gas to escape into the apartment. Ms. Hernandez attempted to light a candle near the Cylinder, which caused the leaked gas to catch fire. This flash fire ignited the leak in the Cylinder, causing a small flame to shoot from its neck. Mr. Englebrick noticed the flame and attempted to move the cylinder out of the apartment. At some point, however, he dropped the Cylinder, and it exploded. Plaintiffs allege that this explosion was the result of a metallurgical failure of the Cylinder's brazed "bushing" at its neck. (Id. ¶ 23.) The flames from the Cylinder caused third degree burns to over seventy percent of Mr. Englebrick's body and forced Ms. Hernandez to jump out of a window to escape the flames. (Id. ¶¶ 20, 22–24.)

Worthington has a very different theory of the cause of the fire. Worthington maintains that the fire was not caused by a metallurgical defect, but rather by Plaintiffs' negligence and abuse of the Cylinder. Specifically, Worthington contends that, at the time of the fire, Plaintiffs were actually using the Cylinder as a heat source in order to smoke meth. While using the Cylinder in this way, Mr. Englebrick burned himself and threw the Cylinder to the ground. The force of the Cylinder hitting the ground, Worthington maintains,

1. Plaintiffs initially filed this action in October 2008 in Orange County Superior Court, and it was subsequently removed to this Court in November 2008. (Dkt. No. 1.) Plaintiffs originally named as defendants WII, Newell Operating Company d/b/a Bernzomatic Corporation, and Lowe's. Lowe's was later dismissed. WCW was added as a defendant in this action in July 2011 with the filing of the Second Amended Complaint.

was the cause of the explosion and resulting fire.

## A. Depositions and Request for Admission

The parties conducted extensive discovery over the course of more than four years of litigation. As part of discovery, Worthington deposed Mr. Englebrick twice, once on August 12, 2009 and again October 28, 2009, and deposed Ms. Hernandez once on August 11, 2009. Worthington also sought requests for admissions from Plaintiffs. During the depositions and in the requests for admissions, Plaintiffs were asked numerous questions regarding their history of meth use, both on the date of the fire and prior to it. Plaintiffs repeatedly denied ever using the Cylinder to smoke meth and denied being under the influence of meth at the time of the fire.

Though Mr. Englebrick admitted at his first deposition to having used meth in the past, he downplayed the extent of his drug use, especially his use near the time of the fire. Specifically, Mr. Englebrick testified that: (1) he had not used meth the Saturday before the fire, (Englebrick Dep. Vol. I 35:13–16); (2) he had not used meth the Sunday before the fire, (*id.* 35:18–20); (3) he did not have any meth in his house on the day of the fire, (*id.* 38:10–12); (4) he did not have any drug paraphernalia in his house on the day of the fire, or the Sunday or Saturday before the fire, (*id.* 40:19–41:3; 45:19–23); and (5) he had not taken any illegal drugs since the day of the fire, (*id.* 47:7–9).

At his second deposition, Mr. Englebrick again downplayed the extent of his meth use. He specifically testified that: (1) he was not under the influence of any illegal drugs on the day of the fire, (Englebrick Dep. Vol. II 6:21–23); (2) he had never taken meth seven days in a week, (*id.*

109:3–5); and (3) he had only used meth by snorting and smoking it, (*id.* 110:4–6). Mr. Englebrick also presented to Worthington a box of cold medication which he stated he believed he had been taking at the time of the fire. (*Id.* 180:16–25; 191:25–192:4.) Mr. Englebrick testified that he decided to look for the box of cold medication after Worthington had asked a question at the previous deposition about behind-the-counter cold medications. (*Id.* 190:20–191:3.)

Worthington also inquired into Mr. Englebrick's meth use in numerous requests for admissions. In his December 14, 2009 response to a series of requests of admissions, Mr. Englebrick again denied being under the influence of meth at the time of the fire:

*REQUEST FOR ADMISSION NO. 3:*

Admit that you, Bradley Englebrick, were under the influence of meth at the time of the accident on April 7, 2008.

*RESPONSE TO REQUEST FOR ADMISSION NO. 3:*

Deny.

(Trial Exh. 786 at 2.)

Ms. Hernandez was also asked numerous questions at her deposition regarding her use of meth. Like Mr. Englebrick, Ms. Hernandez downplayed the extent of her meth use. For example, she testified that she had only smoked meth once, "years ago," (Hernandez Dep. 38:19–22), and that she and Mr. Englebrick never stayed "up all night doing meth," (*id.* 48:9–10).

## B. Worthington's Defense

Worthington strongly suspected that Plaintiffs were not being truthful about their meth use and the events leading up to the fire. In crafting their defense, Worthington conducted extensive discovery on these points. For example, Worthington

retained three experts—Dr. Spihler, a toxicologist, Dr. Smith, a drug use expert, and Craig Hammer, a drug enforcement officer with the Department of Justice—in order to "(a) obtain further information on drug use by plaintiffs, (b) understand the impact of drugs on plaintiffs and (c) identify ways to determine how to prove plaintiffs were lying about their drug use." (Dkt. No. 455 [Nagle Decl.] ¶ 2.) Each of these experts were deposed by Plaintiffs, and Worthington incurred significant fees and costs associated with preparing for and attending each deposition. (*Id.*)

Worthington also deposed over 30 witnesses for the express purpose of uncovering Plaintiffs' suspected lies regarding their meth use. (*Id.* ¶ 3.) Specifically, Worthington deposed the following individuals: Dr. Micheline Ghurabi, May Kim, Sandra Truong, Dr. Karen Don, Vickie Robinson, Susie Ro, Dr. Stanley Arnold, Monica Englebrick, Jeri Hipp, Robert Hipp, Georgean Aseltine, Rachelle Beasley, Frank Devlin, Rafael Rodriquez, Norman Neff, Ron Lutes, July Di Antonio Amaish, Courtney Ramos, Dr. Robert Bader, Tiffany Binion, Deborah Green, Noel Perea, Shelley Miller, Art Amidon, Jean Callahan, Dr. Narinder Singh, Justin Beasley, Rocio Cerna, Gregory Koch, Martha Porter, G. MacGregor, and Sherrie Joslin. (*Id.* ¶¶ 3–6.)

Many of these depositions confirmed Worthington's suspicions that Plaintiffs were lying about the extent of their drug use. For example, Plaintiffs' housemate, Vickie Robinson, testified at her deposition that she witnessed Mr. Englebrick and Ms. Hernandez using a MAPP gas cylinder to smoke meth on numerous occasions, (Dkt. No. 468 [Robinson Dep.] at 17:11–18:1), and had personally smoked meth with Plaintiffs using such a cylinder, (*id.* at 25:1–6). Ms. Robinson also testified that between meth smoking sessions, Plaintiffs

would occasionally leave the cylinder ignited for up to an hour. (*Id.* at 30:18–31:15.) Dr. Micheline Ghurabi, who treated Ms. Hernandez on the day of the fire, testified at deposition that Ms. Hernandez admitted to smoking meth. (Dkt. No. 463, Exh. 2 [Ghurabi Dep.] at 22:4–20; 30:2–10.) Dr. Ghurabi also testified that based on Ms. Hernandez's physical appearance and statements, she appeared to be under the influence of meth on the day of the fire. (*Id.* at 24:18–23; 26:4–7; 37:2–38:2.) Sandra Michelle Truong, a licensed clinical social worker who also treated Ms. Hernandez on the day of the fire, testified at deposition that Ms. Hernandez admitted to using meth. (Dkt. No. 463, Exh. 1 [Truong Dep.] at 20:5–8.) Additionally, July Di Antonia Amaish, who works for the Roque Center, a drug detox facility, testified at deposition that Ms. Hernandez admitted to smoking meth on multiple occasions during the month prior to the fire. (Dkt. No. 465 [Amaish Dep.] at 48–60.) Finally, Dr. Karen Don, who treated Mr. Englebrick after he was discharged from the hospital, testified at deposition that Mr. Englebrick admitted to using meth at the time of the fire, but stated that it was not the cause of the fire. (Dkt. No. 470 [Don Dep.] at 20:16–21:22.)

Worthington also suspected that Mr. Englebrick was lying about the cold medication box he produced at his second deposition. In order to disprove Mr. Englebrick's claim that he had been taking the medication at the time of the fire, Worthington's counsel traveled to Maryland to depose a representative of CVS, the manufacturer of the cold medication. (Nagle Decl. ¶ 3.) From this deposition, Worthington learned that the box of medication was actually manufactured four months after the date of the fire. (*Id.*) It was therefore impossible that Mr. Englebrick had been taking that specific medication on the date of the fire.

## C. Trial

The Court began a bench trial on February 12, 2013, following more than four years of litigation. During their trial testimony, Plaintiffs for the first time admitted that their meth use had been significantly more extensive than they had previously represented. Mr. Englebrick, for example, testified that he had used meth on a regular basis for the past 20 years. (*See* Trial Trans. Vol. IV 27:9–28:22, Feb. 22, 2013.) Specifically, he stated that he had been using meth through a suppository method approximately twice a day for a significant period of time prior to the fire. (*Id.* 27:23–28:3; 28:14–17.) Mr. Englebrick admitted that, contrary to his deposition testimony and response to Worthington's request for admission, he was under the effects of meth at the time of the fire:

> Q: So do you believe you were under the influence of meth at the time of the fire?
>
> A: I mean, I'm sure it still had some effect on me. Not gonna tell you it possibly didn't.[2]

(Trial Trans Vol. IV 10:6–9, Feb. 21, 2013.)

Mr. Englebrick also admitted that he intentionally gave false testimony while under oath at his depositions in order to hide the extent of his meth use:

> Q: Isn't it true that you gave false testimony multiple times at your first deposition?
>
> A: I was hiding the fact that I was doing meth, yes.
>
> Q: Isn't it true that you gave false testimony multiple times at your second deposition, after you were caught giving false testimony at your first deposition?

> A: Again, I was still trying to hide the fact that I—I had been doing it.

(Trial Trans. Vol. II 13:15–22, Feb. 21, 2013.) Specifically, Mr. Englebrick admitted to knowingly giving the following false testimony while under oath at deposition: (1) he had not used meth the day before the fire, (Trial Trans. Vol. I 20:19–25, Feb. 21, 2013); (2) he had not used meth two days before the fire, (*id.* 23:4–10); (3) he did not know why he tested positive for amphetamines on the day of the fire, (*id.* 20:13–22); (4) he never took meth seven days a week, (*id.* 25:20–25; 26:1–2); (5) he did not have any meth in his apartment on the Saturday before the fire, (*id.* 27:7–13); (6) there was no drug paraphernalia in his apartment on the day of the fire, or the Saturday or Sunday before the fire, (*id.* 27:14–25; 28:1–25; 29:1–7); and (7) he only used meth by snorting and smoking it, (*id.* 30:11–21). In fact, Mr. Englebrick admitted that "[p]retty much anything in reference to taking drugs before the fire that I said no to on Saturday or Sunday [before the fire] was obviously not going to be true." (*Id.* 27:14–21.)

Mr. Englebrick additionally admitted to presenting fabricated evidence at his second deposition in an attempt to mislead Worthington. When Mr. Englebrick was admitted to the hospital on the day of the fire, his treating physician ordered urine and blood drug screens, which came back positive for amphetamines. (*See* Dkt. No. 454, Exh. 18). At his second deposition, Mr. Englebrick produced a box of cold medication that he stated he had been taking at the time of the fire. (Englebrick Dep. II 189:22–190:19.) At trial, Mr. Englebrick admitted that he presented Worthington with the cold medication box in an

---

**2.** Mr. Englebrick later clarified this statement by explaining: "I was probably answering a question an expert should have answered, but I was saying maybe there is some sort of trace in my system or something like that, was what I was talking about. But I wasn't under the effects of it I don't believe at all." (Evd. Hearing Trans. 147:24–148:2, Mar. 19, 2013.)

attempt to fool Worthington into believing that the medication was the source of the positive drug tests:

Q: At your second deposition, you produced [the box of cold medication] for the purpose of causing Worthington to believe that this is why you tested positive for amphetamine; that you were taking this cold medication.

A: I guess I wanted everybody to believe that, yes.

. . .

Q: So when you testified in deposition, the second deposition that this medication was medication you were taking on the day of the accident, that was false?

A: I testified that I believed that that was medication, and at that time I did. I just wanted everybody to believe that was the reason the test was positive.

Q: Right. You wanted to fool Worthington?

A: I didn't want anybody to know about my meth use. I was trying to cover it up.

(Trial Trans. Vol. I 36:1–11; 36:25–37:8, Feb. 22, 2013.)

During her trial testimony, Ms. Hernandez also admitted to giving false testimony while under oath at her deposition. Specifically, she admitted that she lied when she stated that she had only smoked meth once, "years ago." (Hernandez Dep. 38:19–22.) At trial, she testified that she could not remember exactly how many times she had smoked meth, but that "of course it was more than 10 [times]." (Trial Trans. Vol. I 10:16–23, Feb. 20, 2013.) In fact, Ms. Hernandez testified that smoking was her preferred method of using meth. (*Id.* 13:10–14:6.) When asked why she had testified at deposition that

she had only smoked meth once, she replied: "I don't know why I did that. It was something that I did not want to tell everybody at the time. I was worried about what my kids would think if they found out, and I just did." (*Id.* 10:24–25; 11:1–3.) Ms. Hernandez also testified contrary to her deposition testimony regarding her and Mr. Englebrick's meth habits. At deposition, Ms. Hernandez testified that she and Mr. Englebrick never stayed "up all night doing meth." (Hernandez Dep. 48:9–10.) At trial, however, she testified that she did not deny that "quite often" she and Mr. Englebrick "stayed up all night taking meth." (Trial Trans. Vol. I 16:17–21, Feb. 20, 2013.)

Ms. Hernandez further admitted to withholding from Worthington information related to her treatment for drug abuse. Two days after the fire, Ms. Hernandez checked into a drug detox facility called the Roque Center, where she stayed for a week. (Trial Trans. Vol. I 43:15–20, Feb. 20, 2013.) At her deposition, Ms. Hernandez was asked to identify all the places she stayed following the fire, but she did not mention the Roque Center.[3] (*Id.*) At trial, Ms. Hernandez admitted that she intentionally withheld such information:

Q: During deposition we asked you to identify all the places that you stayed after the accident; correct? Do you remember that?

A: Yes, I do.

Q: And you did not tell us about the Rocque (sic) Center, did you?

A: No, I did not.

Q: Why not?

A: Because I didn't think that was anything that was relevant to the fire.

. . .

---

**3.** Nearly a year later, Ms. Hernandez did identify the Roque Center in her response to special interrogatories dated March 8, 2010. (Huang Decl. Exh. 32 at 3.)

Q: So you weren't truthful about that; correct?

. . .

A: I wasn't—no, I was not. I did not. (*Id.* 43:15–23; 45:14–22.)

Following Plaintiffs' revelations at trial, Worthington renewed a prior motion to dismiss the case based on Plaintiffs' perjury.[4] The Court suspended the trial and set a briefing and hearing schedule in order to decide Worthington's motion to dismiss. (Dkt. No. 447.)

**D. Evidentiary Hearing**

On April 15, 2013, the Court held an evidentiary hearing related to Worthington's motion to dismiss at which both Mr. Englebrick and Ms. Hernandez testified. At the hearing, Plaintiffs continued to change their testimony or otherwise give evasive answers regarding their admittedly false statements. For example, at trial, when Ms. Hernandez was asked why she did not disclose at deposition that she had stayed at the Roque Center, she replied: "Because I didn't think that was anything that was relevant to the fire." (Trial Trans. Vol. I 43:19–23, Feb. 20, 2013.) At the evidentiary hearing, however, in response to the same question, she stated that she did not inform Worthington about the Roque Center because she "didn't even remember about that at the time." (Evd. Hearing Trans. 47:21–48:8; 93:1–8, Mar. 19, 2013.) Later at the evidentiary hearing, Ms. Hernandez changed her testimony yet again: "I didn't think that not telling you about the Roque Center or whatever, that it was something—that it was not telling you the truth because I didn't say anything about it.... I didn't say anything because I didn't think it had anything to do with the trial." (*Id.* 79:24–80:1.) In

Plaintiffs' opposition to Worthington's motion to dismiss, Ms. Hernandez maintains that she simply forgot about the Roque Center during her deposition. (Pls.' Opp'n at 7 ("Ms. Hernandez's failure to disclose her stay at the Roque Center during her deposition was a result of a lack of memory of where she specifically resided after the fire.").)

Ms. Hernandez also changed her trial testimony regarding whether she saw a meth pipe in her bedroom prior to the fire. At trial Ms. Hernandez testified that she had, indeed, seen a meth pipe:

Q: At any time before the day of the accident, did you ever see of a meth pipe in your bedroom at the Cedar Street house?

A: Yes, I did.

Q: When did you see a meth pipe in your bedroom at the Cedar Street house before the accident?

A: Before the accident, probably a few months before that.

(Trial Trans. Vol. I 5:13–18, Feb. 20, 2013.) At the hearing, Ms. Hernandez denied seeing a meth pipe and insisted that her trial testimony was the result of a misunderstanding:

Q: You testified at trial that you saw a meth pipe a few months before the accident in your bedroom; correct?

. . .

A: I testified to that[?]

Q: Yes.

A: I must have misunderstood a question that you asked me then.

. . .

Q: So you don't recall seeing a meth pipe in your bedroom a few months before the accident; is that right?

---

**4.** Worthington previously filed a motion to dismiss based on perjury on May 9, 2011.

(Dkt. No. 238.) The Court denied the motion on June 23, 2011. (Dkt. No. 286.)

A: I'm not sure. No. I don't remember saying that, no.

(Evd. Hearing Trans. 65:2–13, Mar. 19, 2013.)

Plaintiffs also provided evasive, inconsistent, and unreliable testimony regarding when Ms. Hernandez learned that Mr. Englebrick had been using meth on a daily basis prior to the fire. At trial, Mr. Englebrick testified that he told Ms. Hernandez in late 2009 or early 2010 about his daily meth use. (Trial Trans. Vol. IV 17:21–18:8, Feb. 21, 2013.) At the evidentiary hearing, however, he stated that the conversation took place about a year ago, and expressed surprise that he would have testified otherwise. (Evd. Hearing Trans. 101:25–102:2, Mar. 19, 2013.) When confronted with his trial testimony, Mr. Englebrick simply stated: "I don't remember saying that." (*Id.* 102:3–9.) Ms. Hernandez also gave non-credible answers regarding what Mr. Englebrick told her and when. Ms. Hernandez was specifically asked whether Mr. Englebrick previously informed her about his daily meth use before the fire, to which Ms. Hernandez replied: "I don't recall. I don't remember if he did or not." (*Id.* 73:17–19.) Later, however, she confidently stated that the first time she learned about Mr. Englebrick's daily meth use was during his trial testimony. (*Id.* 74:15–22.)

Mr. Englebrick changed his testimony in a number of other ways at the evidentiary hearing. For example, he denied that he knowingly gave false testimony at his deposition regarding his meth use the day before the fire:

Q: Well, you said at your deposition that you hadn't used any meth on the Sunday before the accident. When you gave that testimony, you knew that wasn't true; correct?

A: I don't think I felt that way at the time.

Q: Didn't feel that way?

A: I didn't feel that way at the time.

(Evd. Hearing Trans. 108:10–15, Mar. 19, 2013.) Mr. Englebrick also changed his testimony regarding when he decided to correct the record regarding his previous false statements. Mr. Englebrick testified at trial that for some time after admitting his daily meth use to Ms. Hernandez, he still intended to provide false testimony at trial regarding such meth use. (Trial Trans. Vol. IV 22:15–18, Feb. 21, 2013.) At the hearing, however, he flatly denied this. (Evd. Hearing Trans. 112:9–11, Mar. 19, 2013.)

## III. ANALYSIS

■ District courts have inherent authority to sanction parties who provide false testimony or engage in deceptive conduct. *Fink v. Gomez,* 239 F.3d 989, 994 (9th Cir.2001); *see Chambers v. NASCO, Inc.,* 501 U.S. 32, 44–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers,* 501 U.S. at 44, 111 S.Ct. 2123. A court's inherent authority includes the power to dismiss an action "when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Wyle v. R.J. Reynolds Indus., Inc.,* 709 F.2d 585, 589 (9th Cir.1983); *see Halaco Eng'g Co. v. Costle,* 843 F.2d 376, 380 (9th Cir.1988) (stating that district courts have the inherent power to dismiss cases based on discovery abuses). The Ninth Circuit has stated that a court must consider the following factors in determining whether to exercise its inherent power to dismiss a case: "(1) the existence of certain extraordinary circumstances, (2) the presence of willfulness, bad faith, or fault by the offending party, (3) the efficacy of lesser sanctions, (4) the relationship or nexus be-

tween the misconduct drawing the dismissal sanction and the matters in controversy in the case, and finally, as optional considerations where appropriate, [and] (5) the prejudice to the party victim of the misconduct...." [5] *Halaco*, 843 F.2d at 380. All of these factors strongly weigh in favor of dismissal.

## A. Extraordinary Circumstances

 "[E]xtraordinary circumstances exist where there is a pattern of disregard for Court orders and deceptive litigation tactics that threaten to interfere with the rightful decision of a case." *In re Napster, Inc. Copyright Litig.*, 462 F.Supp.2d 1060, 1071 (N.D.Cal.2006). Providing false testimony during a deposition is the sort of extraordinary circumstance warranting dismissal. *See Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 488 (9th Cir.1991) ("Dismissal is an appropriate sanction for falsifying a deposition."); *see also Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 78 (5th Cir.2011) (affirming dismissal of an employment discrimination case where the plaintiff lied at deposition about the reason he quit his job); *Martin v. DaimlerChrysler Corp.*, 251 F.3d 691, 695 (8th Cir.2001) (affirming dismissal of an employment discrimination case based on the plaintiff's false statement at deposition that she had never been a party to another lawsuit against a past employer and based on her failure to identify all of her health care providers); *Nichols v. Klein Tools, Inc.*, 949 F.2d 1047, 1049 (8th Cir.1991) (affirming dismissal where the plaintiff fabricated deposition testimony in order to prevent the defendant from presenting its case).

 The circumstances here are truly extraordinary. Plaintiffs repeatedly lied under oath during the entire pretrial process about their extensive meth use and addiction. That use and addiction was essential to Worthington's defense that Plaintiffs were under the influence of meth at the time of the fire and that the fire was actually caused by Mr. Englebrick's misuse of the Cylinder. Because of Plaintiffs' lies, Worthington had to spend hundreds of hours and hundreds of thousands of dollars in attorneys' fees to uncover the truth about Plaintiffs' meth use and the potential cause of the fire. It is now impossible for the Court to believe a word that Plaintiffs have to say at trial about the fire or anything having to do with it. Plaintiffs' perjury and deceptive misconduct clearly qualifies as extraordinary circumstance justifying dismissal of their claims against Worthington.

## B. Presence of Willfulness, Bad Faith, or Fault

 "[D]isobedient conduct not shown to be outside the control of the litigant is all that is required to demonstrate willfulness, bad faith, or fault." *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 948 (9th Cir.1993) (quoting *Fjelstad*, 762 F.2d at 1341). Providing false or incomplete information during a deposition or in a response to a discovery request constitutes the sort of willfulness, bad faith, or fault required for dismissal. *See Arnold v. Cnty. of El Dorado*, No. 2:10–CV–3119 KJM GGH, 2012 WL 3276979, at *4 (E.D.Cal. Aug. 9, 2012) (plaintiff acted in

---

**5.** Plaintiffs additionally argue that the Court should consider a sixth factor: "the government interests at stake." *Halaco*, 843 F.2d at 380. Plaintiffs assert that even though the government is not a party to this case, dismissal is not proper because there is a strong public interest in a judgment on the merits.

However, there is no public interest in allowing cases to proceed in which a party's misconduct has "infected all of the pretrial procedures and interfered egregiously with the court's administration of justice." *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir.1987). Such is the case here.

bad faith by lying at her deposition); *Lowry v. Heritage Sec.*, No. 09–CV–882–BTM WVG, 2011 WL 7769329, at *10, *14 (S.D.Cal. July 7, 2011) *report and recommendation adopted sub nom. Lowry v. Metro. Transit Bd. MTBS*, No. 09CV00882, 2012 WL 1439078 (S.D.Cal. Apr. 26, 2012) (plaintiff acted with willful disobedience in refusing to answer an interrogatory requesting his residence address, even though plaintiff refused to provide such information to protect his privacy); *see also Newman v. Brandon*, No. 1:10–CV–00687 AWI JL, 2012 WL 4983478, at *5 (E.D.Cal. Oct. 16, 2012) (plaintiff acted willfully and in bad faith in submitting falsified declarations in connection with a motion for summary judgment).

 Plaintiffs' deception is inexcusable. Plaintiffs knew that they were addicted to meth. Plaintiffs knew that Mr. Englebrick had used meth on the days leading up to the fire. And Plaintiffs knew that Worthington's defense to their claims depended on Worthington establishing their extensive meth use and addiction. Yet Plaintiffs lied over and over again in deposition and discovery about their meth use and addiction. Plaintiffs never once made any effort to set the record straight. They never filed any corrections or changes to their deposition transcripts. They never filed any amended discovery responses. Instead, Plaintiffs let Worthington spend significant time and money litigating their lies during the entire pretrial process. It was not until two weeks into the trial that Plaintiffs disclosed their perjury. By that time, however, it was too late. Worthington already had invested the time and money needed to expose Plaintiffs' lies and destroy their credibility as witnesses. Plaintiffs' deliberate deception warrants dismissal of their claims.

## C. Lesser Sanctions

 "The district court must, before dismissing an action under its inherent powers, consider less drastic sanctions." *Halaco*, 843 F.2d at 381. This requires "a reasonable explanation of possible and meaningful alternatives," *id.*, though "[t]he district court need not exhaust every sanction short of dismissal before finally dismissing a case ...," *Henderson v. Duncan*, 779 F.2d 1421, 1424 (9th Cir.1986). What is most important for case-dispositive sanctions is whether the misconduct "threaten[s] to interfere with the rightful decision of the case." *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir.1998). Accordingly, "[d]ismissal is appropriate where a pattern of deception and discovery abuse [make] it impossible for the district court to conduct a trial with any reasonable assurance that the truth would be available." *Id.* (citing *Anheuser–Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 352 (9th Cir.1995)); *see Oil States Skagit Smatco*, 664 at 79 (affirming district court's determination that dismissal was the only appropriate sanction where a plaintiff lied at deposition); *Arnold*, 2012 WL 3276979 at *15 (holding that lesser sanctions would not be appropriate where a plaintiff repeatedly lied at deposition and refused to comply with discovery obligations); *Knapp v. Convergys Corp.*, 209 F.R.D. 439, 443 (E.D.Mo.2002) (finding that lesser sanctions, such as monetary sanctions or re-opening of discovery, would not repair the harm to defendants caused by plaintiff's false responses to interrogatories).

 Lesser sanctions will not address the harm caused by Plaintiffs' deception. The pretrial process is over. It took four years and hundreds of thousands of dollars in attorneys' fees to complete. Worthington spent a substantial portion of that time

and money litigating Plaintiffs' denials of their meth use and addiction. Had Plaintiffs been truthful at the outset of the case, Worthington never would have had to spend so much time and money to prove that Plaintiffs' denials were lies. Lesser sanctions certainly will not compensate Worthington for the significant time and money that it has invested, and unfortunately now wasted. Nor will lesser sanctions restore the credibility of Plaintiffs as witnesses regarding the true cause of the fire. Plaintiffs' repeated lies under oath about their meth use and addiction over the past four years, not to mention their later unreliable testimony at the evidentiary hearing attempting to explain those lies, make it impossible for the Court now to believe a word they say about the cause of the fire. Dismissal is really the only meaningful sanction available to the Court at this late juncture.

**D. Relationship Between Misconduct and Matters in Controversy**

"The most critical criterion for the imposition of a dismissal sanction is that the misconduct penalized must relate to matters in controversy in such a way as to interfere with the rightful decision of the case." *Halaco*, 843 F.2d at 381. A plaintiff's drug use is highly probative of product misuse and proximate cause. *See, e.g., Bocanegra v. Vicmar Services, Inc.*, 320 F.3d 581, 587 (5th Cir.2003) (holding that evidence of a plaintiff's marijuana use eight hours prior to a motor vehicle fire was relevant where an expert testified that marijuana use can affect cognitive functions for up to 12 hours after the acute high has worn off); *Gen. Motors Corp. v. Walden*, 406 F.2d 606, 608 (10th Cir.1969) (stating that a driver's intoxicated state could be relevant to whether a defect in the vehicle was actually the cause of an fire); *Harris v. Kubota Tractor Corp.*, No. CIV.04–2490, 2006 WL 2734460, at *3

(W.D.La. Sept. 22, 2006) ("Evidence of [the plaintiff's] use of cocaine and marijuana during the week of his accident is relevant because it may, in the mind of the jury, tend to establish that [the plaintiff] was impaired at the time of the accident, an issue in this case."); *Evans v. Toyota Motor Corp.*, No. CIV.A. V–03–09, 2005 WL 3844071, at *5 (S.D.Tex. Sept. 2, 2005) (holding that evidence of a plaintiff being under the influence of marijuana and prescription drugs was highly probative of the plaintiff's ability to "react, perceive and reason" at the time of an accident); *Hansen v. Gen. Motors Corp.*, 915 F.Supp. 118, 121 (E.D.Mo.1996) (evidence of plaintiff's intoxication relevant where defendant's theory of case was that a car engine fire was caused by the intoxicated plaintiff falling asleep with his foot on the car's gas pedal, rather than a defect in the car); *Wallace v. Ford Motor Co.*, 318 N.J.Super. 427, 433, 723 A.2d 1226 (1999) ("[E]vidence of alcohol consumption by the injured plaintiff prior to the accident may be admissible in a products liability case because such evidence may be relevant to the issue of proximate cause." (internal quotations and alterations omitted)).

Plaintiffs' deception was directly related to the parties' controversy. The critical issue involved in the case is how did the fire start. Worthington from the get go has contended that the fire resulted from Mr. Englebrick's misuse of the Cylinder while under the influence of meth. Establishing that Mr. Englebrick had a meth addiction and routinely used the Cylinder to smoke the drug is persuasive evidence that the fire occurred as contended by Worthington. On the other hand, if Mr. Englebrick was not under the influence of meth on the day of the fire and had no addiction to the drug, the fire mostly likely resulted from a defective cylinder manufactured by Worthington, making it

liable for the fire and Plaintiffs' serious injuries. This was arguably the motive behind Plaintiffs' deception. In any event, Worthington developed its trial strategy and defense to respond to Plaintiffs' denials of their meth use and addiction. Plaintiffs' deception, therefore, unquestionably related to the parties' controversy. Indeed, it was at the center of the controversy and the primary focus of Worthington's defense.

### E. Prejudice

As an optional factor, a court may consider the prejudice caused by a party's misconduct. *Halaco*, 843 F.2d at 380. A party is prejudiced where the misconduct impaired its "ability to go to trial and *threatened* to interfere with the rightful decision of the case." *Anheuser–Busch*, 69 F.3d at 354 (emphasis in original). Parties are prejudiced if "forced to formulate their case around gaping omissions and guesswork." *Arnold*, 2012 WL 3276979 at *14; *see Anheuser–Busch*, 69 F.3d at 354; *Lowry*, 2011 WL 7769329 at *16 (plaintiff's refusal to disclose his residence address prejudiced the defendant because it foreclosed an "avenue of investigation result[ing] in [a] lessened ability to mount a complete defense"). Belated attempts to mitigate the damage caused by a party's misconduct do not negate the prejudice. *See Anheuser–Busch*, 69 F.3d at 354 ("This court has squarely rejected the notion that a failure to comply with the rules of discovery is purged by belated compliance."); *N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir.1986) ("Last-minute tender of documents does not cure the prejudice to opponents nor does it restore to other litigants on a crowded docket the opportunity to use the courts.").

Plaintiffs' deception has already prejudiced Worthington, and it will continue to prejudice Worthington if the Court proceeds with the trial. Worthington spent enormous amounts of time and money, including retaining three experts and taking more than 30 depositions, to respond to Plaintiffs' denials of their meth use and addiction. Plaintiffs do not have the resources to reimburse Worthington for that time and money. To make matters worse, Plaintiffs have put Worthington at a significant disadvantage. Worthington developed its trial strategy to respond to Plaintiffs' denials about their meth use and addiction. It did not prepare a trial strategy in which Plaintiffs' meth use and addiction were a given. The Federal Rules of Civil Procedure, however, provide Worthington with the right to conduct necessary discovery and trial preparation on Plaintiffs' admitted meth use and addiction, including investigating the medical plausibility of Mr. Englebrick's suppository method of using meth. *See* Fed.R.Civ.P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."). Proceeding with the trial would deny Worthington that very important right.

## IV. CONCLUSION

Plaintiffs' lies under oath and false discovery responses have compromised the legal proceedings and prejudiced Worthington. The Court has no meaningful alternative at this late stage but to dismiss Plaintiffs' claims against Worthington. Accordingly, Worthington's motion to dismiss is GRANTED.