# IN THE COURT OF APPEALS OF IOWA

No. 13-0754
Filed October 29, 2014

**THE ESTATE OF MICHAEL LUDWICK, by and through its Duly Appointed Legal Representative, Jean Sorsen,**
Plaintiff-Appellant,

**vs.**

**STRYKER CORPORATION, a Corporation; STRYKER BIOTECH LLC, a Corporation and a Wholly Owned Subsidiary of Stryker Corporation; Various unknown subsidiaries of Defendant Stryker Corporations; CATHOLIC HEALTH INITIATIVES-IOWA, CORP., d/b/a Mercy Hospital Medical Center in Des Moines, Iowa, a Corporation; and IOWA ORTHOPAEDIC CENTER, P.C., a Corporation,**
Defendants-Appellees.

_____

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

The plaintiff appeals from the dismissal of its wrongful-death lawsuit by the district court as a sanction for failure to disclose evidence to the defendants. **AFFIRMED.**

Marc A. Humphrey of Humphrey Law Firm P.C., Des Moines; Justin K. Swaim, Des Moines; and Stuart L. Higgins of Higgins Law Firm, PLLC, Des Moines, for appellant.

David N. May of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines; Robert M. Connolly, Douglass Farnsley, and Jamie K. Neal of Stites & Harbison, PLLC, Louisville, Kentucky; and Joshua Levy of Ropes & Gray, LLP, Boston, Massachusetts, for appellees Stryker Corporation and Stryker Biotech LLC.

Connie L. Diekema and Jeffrey A. Craig of Finley, Alt, Smith, Scharnberg, Craig, Hilmes & Gaffney, P.C., Des Moines, for appellee Catholic Health Initiatives-Iowa Corp., d/b/a Mercy Hospital Medical Center in Des Moines, Iowa.

Robin L. Hermann of Patterson Law Firm, L.L.P., Des Moines; and Maja C. Eaton and Tacy F. Flint of Sidley Austin LLP, Chicago, Illinios, for appellee Iowa Orthopaedic Center.

Heard by Vaitheswaran, P.J., and Doyle and McDonald, JJ.

**PER CURIAM.**

The district court dismissed the Estate of Michael Ludwick's wrongful-death action as a sanction for violating its duty to provide and supplement discovery as set forth in the Iowa Rules of Civil Procedure. The Estate appeals, contending, among other things: (1) the court lacked authority to dismiss its claims as a sanction because it did not violate a court order, since there was no court order in existence compelling discovery for it to violate; and (2) even if it did have authority, the court abused its discretion in ordering dismissal as a sanction. Because we conclude the district court possessed the requisite authority to impose the sanction of dismissal under the facts of this case and it did not abuse its discretion, we affirm the dismissal.

### I. Background Facts and Relevant Proceedings.

In June 2006, Michael Ludwick severely fractured his right leg while working out of state. Immediate surgery was required, and pins and a rod were utilized in an attempt to repair the fracture. Ludwick returned to Iowa, and he saw Dr. Craig Mahoney, an orthopedic surgeon with the Iowa Orthopaedic Center, for follow-up care of his leg.

After several months of care, Dr. Mahoney determined Ludwick's fractured bones were not healing properly, a complication called a "nonunion," and he concluded that an additional surgery would be necessary. In March 2007, Dr. Mahoney performed the surgery to treat the nonunion at Mercy Hospital. In the surgery, Dr. Mahoney used the Stryker Biotech product "OP-1 Implant," a naturally-occurring protein that promotes new bone growth.

Two and a half months after the surgery, Ludwick collapsed at his girlfriend's house, and he was later pronounced dead at the hospital. The chief medical examiner for the State of Iowa, Dr. Julia Goodwin, performed an autopsy and obtained blood samples from Ludwick's heart and femoral artery. In dissecting Ludwick's right lung, Dr. Goodwin discovered foreign body pulmonary emboli she described as rubbery, white protrusions. Additionally, Ludwick's femoral blood was tested and revealed the presence of methamphetamine. Dr. Goodwin ultimately concluded Ludwick's death was caused by "[m]ethamphetamine intoxication complicated by multiple pulmonary emboli."

In 2009, Ludwick's estate filed a wrongful-death action, asserting claims against the defendants of products liability, medical negligence, breach of implied and express warranties, fraud, and conspiracy. The Estate alleged, among other things, Ludwick's death was caused solely by the foreign body pulmonary emboli. The Estate further asserted the foreign body pulmonary emboli resulted from the migration of Stryker Biotech's OP-1 Implant product from the fracture site, through the bloodstream, and then to Ludwick's lungs.

After the Estate's action was filed, the defendants propounded customary discovery requests to the Estate. One interrogatory requested the identity of the Estate's expert witnesses and "the substance of the facts and opinions to which each expert [was] expected to testify." Additionally, a request for production of documents requested the Estate to produce expert witness files, including "test results . . . in the possession of or generated by said expert witness."

As the litigation progressed, the Estate came to focus on Stryker's alleged off-label promotion of the use of its OP-1 Implant product in combination with

another of its products, Calstrux, in treating nonunion fractures. With regard to the methamphetamine found in Ludwick's blood, the Estate contended it played no part in his death, contrary to the opinion of the state medical examiner. Rather, the Estate asserted two theories concerning the positive methamphetamine test: (1) the methamphetamine detected in Ludwick's blood could have come from Ludwick's use of over-the-counter products containing a non-illicit form of methamphetamine, such as a nasal decongestant, a Vicks inhaler, diet pills, herbs, and epinephrine; and (2) the amount of methamphetamine detected in Ludwick's blood would not cause death.

In support of its two theories, the Estate in 2010 obtained the opinions of toxicologists Dr. Saaed Jortani and Dr. Michael Rehberg in the form of affidavits. Both toxicologists explained in their affidavits there are two isomeric forms of methamphetamine: Levo-methamphetamine ("L methamphetamine") and Dextro-methamphetamine ("D methamphetamine"). The "[D methamphetamine] isomer is pharmacologically more active, has a high potential for abuse, and is typically found in illicit preparations while [L methamphetamine] is less centrally acting and found in pharmaceutical preparations such as over-the-counter nasal decongestants."[1] Dr. Jortani cited his own published work concerning the use of

---

[1] For more in-depth discussions on this topic, *see, e.g.*, *United States v. Bogusz*, 43 F.3d 82, 88-89 (3d Cir. 1994) (discussing the chemical distinctions of the two methamphetamine isomers and noting L methamphetamine "is a compound that produces little or no physiological effect when ingested"), *superseded by regulation as recognized in United States v. DeJulius*, 121 F.3d 891, 894 (3d Cir. 1997); *see also Reece v. United States*, 119 F.3d 1462, 1469 (11th Cir. 1997) (noting the sentencing guidelines at that time made distinctions between the two isomeric forms because L methamphetamine "is rarely seen and is not made intentionally, but rather results from a botched attempt to produce" the other form, citing U.S.S.G. App. C., amend. 518, at 423 (Nov. 1, 1995)); Francis M. Esposito, et al., *Evaluation of the 20% D-Methamphetamine Requirement for Determining Illicit Use of Methamphetamine in Urine*, 36 J. Analytical

Vicks inhalers and the detection of methamphetamine in urine in support of the opinion that "the detection of methamphetamine should not lead the reader to assume illicit use of the drug."[2]  Both toxicologists noted no testing had been done on Ludwick's blood sample to determine the form of methamphetamine found therein, and both toxicologists were critical of the medical examiner's limited knowledge of methamphetamine's different forms and her opinion that the positive methamphetamine finding was the result of use of the illicit form of methamphetamine.  Both toxicologists noted witnesses had stated Ludwick had been using diet pills prior to his death, which could possibly explain his positive methamphetamine test result.

In March 2011, the Estate filed its designation of experts and both toxicologists were listed.  Concerning Dr. Jortani, the Estate's notice stated:

> Dr. Jortani is expected to testify about the incident of false positive readings of methamphetamine in routine toxicology studies.  He is expected to educate the jury as to the distinction between [the two forms of] methamphetamine.  Further he will educate the jury that in the field of toxicology, it is well known that certain assays utilized as a method for determining the existence of methamphetamine in a decedent's blood do not distinguish between [the two forms of methamphetamine].  He will further educate the jury that there are several prescription drugs and diet pills as well as over-the-counter medications that will metabolize in human blood as either [form of methamphetamine].  In fact, use of a Vicks [i]nhaler will result in a positive [L m]ethamphetamine reading.  Based upon Dr. Jortani's investigation, he will share with the jury that there are ample reasons to be suspicious of the positive methamphetamine finding . . . .

---

Toxicology, no. 6 (Special Issue) 399, 404 (2012) (summarizing: "The statistical analysis of study data reported in this manuscript supports the current guidance for interpreting positive methamphetamine drug test results: >20% [D m]ethamphetamine indicates a source other than an OTC nasal inhaler.").

[2]  *See* Alphonse Poklis, et al., *Response of the Emit II Amphetamine/Methamphetamine Assay to Specimens Collected Following Use of Vicks Inhalers*, 17 J. Analytical Toxicology, no. 5, 284-286 (1993).

In December 2011, Dr. Jortani was deposed by the defendants. During the deposition, Dr. Jortani reaffirmed his opinions set forth in his 2010 affidavit. Additionally, he testified he was concerned about the "D and L situation" in regards to Ludwick's positive methamphetamine blood test because it had been stated Ludwick had used Vicks inhalers and diet pills prior to his death, which could explain the positive test result. Dr. Jortani explained that "if the L [methamphetamine form was] the only [form of methamphetamine] present [in Ludwick's blood], then . . . [t]here's no other question . . . it was Vicks," ruling out illicit D methamphetamine use. Dr. Jortani testified he could not opine whether methamphetamine played a role in Ludwick's death until he saw the test results concerning the form of methamphetamine present, and he questioned the opinion of anyone concluding Ludwick was a methamphetamine abuser without having first determined the form of methamphetamine present. Because to so conclude would be "extremely premature" in his opinion, he had "kind of pressed for the testing" and stated "we're getting that soon." He explained he had followed up with the lab chosen to do the testing, but because the lab had not yet received Ludwick's blood sample, the test had not yet been performed. However, he stated the medical examiner's office would be sending blood samples to the lab.

On January 9, 2012, Dr. Jortani received the test results from the lab determining the D/L methamphetamine ratio in Ludwick's heart-blood sample was 6.2. The report explained: "D/L Methamphetamine Ratio • Heart Blood: If the D/L Methamphetamine ratio is greater than 0.13, the Methamphetamine found *is probably the result of the use of the DEA Schedule II CNS stimulant (d-*

*methamphetamine*)." (Emphasis added.) This definitively ruled out use of a Vicks inhaler as an explanation of the positive methamphetamine test result. That day, Dr. Jortani phoned one of the Estate's attorneys with the test results. The attorney that spoke with Dr. Jortani "promptly" related the conversation to the Estate's lead litigation counsel, and it was the attorney's belief after the conversation that lead litigation counsel would be following-up with Dr. Jortani to obtain a copy of the written report. However, Dr. Jortani was not asked for a written copy of the test results by the Estate's counsel.

By letter to the Estate's attorneys dated January 30, 2012, Stryker's counsel requested a status update of the blood testing referenced by Dr. Jortani during his deposition. The letter also requested that a copy of the report be provided. Having received no response to the letter, Stryker's counsel on February 16 emailed the Estate's attorneys to follow-up, again requesting any report or results of the blood testing requested by Dr. Jortani. The email requested the materials be provided by February 22, and it noted the email was "a further attempt to resolve this discovery issue without court intervention pursuant to [Iowa Rule of Civil Procedure] 1.517(5)."

The next day, February 17, the Estate's lead litigation counsel responded via email as follows:

> We have no report of the testing yet. We will check and see if Dr. Jortani has received any report yet. If he has a report, it would only be on heart blood, not femoral blood. The state medical examiner's office only had heart blood left in its inventory and the initial testing was performed on femoral blood specimens. We are exploring the issue of whether [the laboratories who performed the initial blood testing] have any femoral blood in their possession to complete the testing. We will let you know.

On February 28, 2012, the Estate supplemented its answers to Stryker's interrogatories, including its request that the Estate provide information of persons knowing of Ludwick's drug use. Therein, the Estate objected to the "misleading nature" of the interrogatory, though it conceded

> the issue of whether or not [Ludwick] ever used methamphetamine will be a disputed issue in this case. From a toxicology perspective, [the Estate] believe[s] that methamphetamine at such low levels in a toxicology report can be explained in several different ways, none of which suggest [Ludwick] was actually using methamphetamine. For example, [the Estate] will provide testimony . . . Ludwick gained significant weight following the leg fracture and . . . ordered some diet pills which he was taking at the time of his death. . . . [B]y reason of the unregulated nature of over the counter diet supplements, [the Estate believes] that is one explanation. Other explanations likewise call into question the validity of that toxicology report, particularly in light of the fact that every family member and person close to [Ludwick] is totally unaware of any such use of drugs by [Ludwick].

The Estate's supplemental answers contained no reference to Vicks inhalers or the test results of the D/L methamphetamine ratio it received in the January 2012 report. The report was never disclosed or provided to the defendants.

Trial commenced on March 23, 2012, and after jury selection, which was not reported, opening statements began March 29. In the Estate's opening, given by its lead litigation counselor, the attorney stated to the jury:

> . . . I want to talk to you about some of the defenses that I think you're going to hear from the [defendants].
> From jury selection, you already know that the toxicology of [Ludwick] came back with levels of methamphetamine in them. We talked about that a little bit in jury selection, and I asked you if you would keep an open mind as to the possible explanations for why that might occur other than the fact that [Ludwick] was illicitly using methamphetamine.
> Let me just share with you what the evidence will provide you on that issue. You will learn from two very qualified toxicologists . . . [including Dr. Jortani] that there are a multitude of substances, both prescription drugs and over-the-counter drugs,

that you can take as an individual and, if you went through blood toxicology, that would generate a positive methamphetamine finding in your toxicology.

There are two different types of methamphetamine: L and D. *And the labs that did these testings did not differentiate between the two.* You will also learn from the evidence that one of the substances that can produce that kind of a finding is diet pills. And we will have testimony from [Ludwick's girlfriend] . . . that he purchased some diet pills. Unfortunately, those were never retained, but he purchased some diet pills to try to help him with the weight.

. . . [H]e purchased diet pills, which is one potential explanation for the positive finding of methamphetamine in his toxicology. And we will—those experts will share that with you. You will also learn from [one of our experts] that epinephrine can sometimes generate a positive methamphetamine finding in his experience in the criminalistics lab over the years. We know [Ludwick] was given epinephrine. And I say that to you because to suggest that [Ludwick] was a user of methamphetamine just does not fit with all of the testimony you will hear.

. . . .

So that's the first issue, the meth issue, that I think you're going to hear a lot of insinuation and things of that nature that Michael Ludwick was a meth user. We don't agree with that, and we think we will present to you a significant amount of evidence that states to the contrary.

. . . .

I want to jump back to the methamphetamine issue. I forgot to mention this. *The question that I think you're going to be confronted with is*, *did that play any role in [Ludwick's] death*? [The d]efendants are going to try to suggest to you that it did. Our experts say that it did not.

(Emphasis added.) After opening arguments, the Estate, on March 29, began presenting its case.

On April 5, 2012, the Estate first called its expert witness, Dr. George Nichols, a forensic pathologist, to testify. Dr. Nichols testified that, in his opinion, Ludwick died as a result of pulmonary embolization caused by foreign body materials in his blood. He further opined that the methamphetamine in Ludwick's blood did not play any role in Ludwick's death. On cross-examination, Dr.

Nichol's agreed there was no doubt that there was methamphetamine in Ludwick's blood, but he further qualified his answer, responding: "The question is, what form of methamphetamine?" The following exchange occurred thereafter:

> Q. [Methamphetamine] causes euphoria, does it not? A. In the D form, not the L form.
> Q. It— A. May I explain?
> Q. I'm sorry. I interrupted you. A. Okay. I am methamphetamine. I have a left side and I have a right side. This is the way chemicals behave. This makes some difference because in some drugs with methamphetamine the right side is the one that does all the stimulant. The left side is what's found in a Vicks inhaler. So all we know is it's me: Methamphetamine. We don't know which one it is because that analysis has never been done, as far as I know.
> Q. So is it your testimony that this methamphetamine came from a Vicks inhaler? A. I have no idea where it came from.

On redirect examination, the Estate's counsel asked Dr. Nichols:

> Q. And, again, I will give you the same caveat that everybody else has on the issue of methamphetamine. The test results that were put up on the board doesn't tell anybody the source of that methamphetamine— A. True.

The Estate next called the state medical examiner to testify. Among other subjects, the medical examiner was questioned regarding the toxicology components of her autopsy evaluation. She testified the femoral blood tested showed the presence of methamphetamine of 337 nanograms per millimeter. In inquiring as to the medical examiner's knowledge of methamphetamine, the Estate began the following line of questioning:

> Q. Now, do you know the difference between D and L methamphetamine? A. Somewhat, yes.
> Q. When I took your deposition several years ago, you really didn't feel comfortable talking about the difference between L and D methamphetamine, did you? A. That's correct.
> . . . .

Q. When this test result came back, . . . did you make an assumption that the positive methamphetamine finding was D methamphetamine?  A.  I didn't think about that.

Q. Do you know the difference in the effects of L methamphetamine on the human body as compared to D methamphetamine?  A.  Yes.

. . . .

Q. Which category of methamphetamine, D methamphetamine or L methamphetamine, has a more adverse effect on the human body?  A.  D methamphetamine.

Q. Do you know what kind of methamphetamine was found in [Ludwick's] body as a result of this first toxicological screen?  A.  No.

Q. And you didn't know that at the time you rendered your cause of death?  A.  That's correct.

In further questioning her opinion, the Estate asked the medical examiner:

Q. But all of [your opinion] is assuming that the source of this methamphetamine is D methamphetamine, or illicit methamphetamine.  Am I understanding your testimony correctly?  A. D methamphetamine is the isomer that has been known to cause the effects on the heart that could result in these types of changes.

Q. And when you rendered your opinion as to cause of death, you didn't even know whether this was D or L methamphetamine.  A.  That's correct.  I did not know.

Q. And do you think, in fairness to [Ludwick], that that's something you should have investigated before you made a determination that that was a cause of death?  A.  No.  At the time I was unaware of that.  There's been more recent research and literature to suggest that . . . L methamphetamine may be more prominent—or is something that we should look at more closely.

At the time the laboratory that we were sending the [test] to was not routinely testing for L and D methamphetamine, which was something that hardly anyone was doing at that time.  But since then, literature has come out to suggest that perhaps we should look at that.

Q. And you agree with that, don't you?  A.  It's something that we should probably look at if enough research comes out to clarify what that would really mean, yes.

At the close of the Estate's direct examination of the medical examiner, the

Estate again referred to the medical examiner's knowledge of the different forms

of methamphetamine:

Q. And at the time you certified meth as a cause of [Ludwick's] death, you didn't know the difference between the two types of meth—

. . . .

Q. You didn't know the type that was the illicit type of meth—

. . . .

A. No.

[COUNSEL FOR THE ESTATE]: I have nothing further . . . . Thank you.

On the evening of April 9, the day before Dr. Jortani was scheduled to testify, Dr. Jortani provided the Estate's attorneys copies of the January 9, 2012 blood-testing-results report, and this was purportedly the first time the Estate's attorneys had physically seen the report showing D methamphetamine was found in Ludwick's blood at a high number compared to the L methamphetamine level found. Despite now having a written report in hand, the report was still not disclosed to the defendants by the Estate's counsel. The next day, during his direct examination, Dr. Jortani essentially volunteered that the testing had been done and that he had received the results. The defendants immediately requested a bench conference, and following the conference, they sought suspension of the trial for the afternoon in order to digest the test results and to determine how to proceed. The court granted their request, and it dismissed the jury for the remainder of the day.

The next morning, the defendants filed a motion for a directed verdict or alternatively, a mistrial, and a hearing was held. The court ultimately granted the mistrial, and it explained in its written order:

Summarizing its ruling made on the record at the conclusion of the hearing, the court concluded that the [Estate's] failure to disclose to the defendants the blood test results, the existence of which were first revealed during the trial testimony of Dr. Jortani,

despite the Stryker defendants' specific request for those results months earlier, so prejudiced the defendants, for the reasons stated in their motion and stated on the record at the time of the hearing, that the court no longer had confidence in the fundamental fairness and integrity of the trial. Additionally, counsel for the [Estate] gave no reasonable explanation for their failure to disclose the test results. Given the nature of the prejudice, the court concluded that it could not be cured by measures short of a mistrial.

The defendants subsequently sought discovery sanctions against the Estate based on the circumstances that led to the mistrial, and they requested the district court dismiss the Estate's claims or impose significant monetary sanctions upon the Estate as its sanction. A series of rulings were issued by the district court thereafter.[3] Ultimately, the district court found that "[c]onsidering the willfulness of the discovery violation, the importance of the evidence that was not disclosed, and the damage caused by the non-disclosure," dismissal of the entire petition was warranted. The court explained in its final ruling:

The court initially concluded that dismissal of the case was an appropriate sanction. Such a sanction would have addressed the harm caused by the violation and . . . would have been fully justified. On reflection, it was probably only the court's general reluctance to impose what would be regarded as the most severe sanction[] that caused the court to search for something less severe and in the process to lose sight of the fact that the sanction it chose wasn't, under the circumstances, any sanction at all. But any reluctance the court had to impose the dismissal sanction was not a

---

[3] The district court initially granted as a sanction dismissal of the Estate's claims related to "the alleged use of, promotion of the use of, or failure to warn about or stop the alleged use of the substance Calstrux in the surgery performed on Mr. Ludwick." In the same ruling, it also sua sponte revisited its prior ruling denying Stryker's summary judgment motion. The court concluded its previous denial of summary judgment was incorrect, and it changed its ruling, granting summary judgment on the same claims it dismissed as a sanction. Thereafter, the defendants protested the court's sanction, arguing it was not really a sanction at all, given the court's new summary-judgment ruling dismissing those same claims for lack of merit. The court agreed and determined the Estate's petition should be dismissed in its entirety as a sanction. Because we find the issue of the imposition of dismissal of the Estate's petition as a sanction by the district court to be dispositive of this appeal, we do not address the Estate's appellate claims concerning the summary judgment ruling.

consequence of uncertainty about whether it was warranted. By application of the facts to the law the dismissal sanction is warranted and the court does not waver from that conclusion. The court has given this matter as much thought as it has ever given any matter, both before and since its [prior] ruling. The court has now concluded that it should have imposed the sanction that its instincts and judgment told it was the right one in the first place, dismissal of the petition.

The Estate's petition was therefore dismissed.

The Estate now appeals. It contends the district court had no authority to enter a dismissal as a discovery sanction, and if it did have such authority, it abused its discretion in doing so.

## II. Discussion—Imposition of Sanctions.

### A. Authority.

We start with these basic principles. "A trial should be a search for the truth, and our rules of discovery are an avenue to achieving that goal. The discovery process seeks to make a trial into a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *Whitley v. C.R. Pharmacy Serv., Inc.*, 816 N.W.2d 378, 386 (Iowa 2012) (internal citations and quotation marks omitted); *see also* Iowa Rs. Civ. P. 1.501-517. To that end, these rules are to be "liberally construed and shall be enforced to provide the parties with access to all relevant facts." Iowa R. Civ. P. 1.501(1). Perhaps most importantly, "[d]iscovery shall be conducted in good faith, and responses to discovery requests, however made, shall fairly address and meet the substance of the request." *Id.* "Generally, noncompliance with discovery is not tolerated." *Whitley*, 816 N.W.2d at 388.

Iowa civil crocedure 101 teaches us, as recently explained again by our supreme court:

> [D]iscovery following the filing of a lawsuit involves any information that is "relevant" and "not privileged." Iowa R. Civ. P. 1.503(1). A variety of discovery methods exist under our rules for a party to gather such information from another party, including the use of written interrogatories. *See* [Iowa R. Civ. P.] 1.509(1) (permitting a party to serve written interrogatories to be answered by the other party). The rules governing interrogatories require a party who has been served with interrogatories to answer each written question unless an objection to the interrogatory is lodged. [Iowa R. Civ. P. 1.509(1)] An objection suspends the obligation to answer until the objection is resolved. *See id.* (requiring either an answer or objection in response to an interrogatory); *see also Schaap v. Chicago & Nw. Ry.*, [155 N.W.2d 531, 533 (Iowa 1968)] (holding a party who withholds an objection to interrogatories waives the objection and is required to make a full answer). Additionally, the rules require a party who has responded to an interrogatory to later supplement or amend the response to include information acquired after the initial response was made when, among other circumstances, the question addressed a matter that bore "*materially upon a claim or defense asserted by any party to the action.*" [Iowa R. Civ. P.] 1.503(4). Consistent with the discovery rules in general, the duty to supplement seeks to clarify issues prior to trial, avoid surprise to parties, and allow a complete opportunity to prepare for trial. *White* [*v. Citizens Nat'l Bank of Boone*, 262 N.W.2d 812, 816 (Iowa 1978)]. Thus, a party has a clear duty to supplement answers to interrogatories.

*Id.* at 386 (emphasis added).

Rule 1.508 sets forth the procedures for discovery concerning expert witnesses. In addition to interrogatories, other means of discovery are available without leave of the court, including taking depositions of expert witnesses, as well as obtaining "discovery of documents and . . . reports." Iowa R. Civ. P. 1.508(1)(b). A party's duty to supplement discovery, as mentioned above, includes experts and is to be done "when the substance of an expert's testimony has been updated, revised, or changed since the response . . . as soon as

practicable, but in no event less than [thirty] days prior to the beginning of trial except on leave of court." Iowa R. Civ. P. 1.508(3); *see also Hagenow v. Schmidt*, 842 N.W.2d 661, 671 (Iowa 2014). Compliance with both parts of rule 1.508(3), "as soon as practicable" and within "thirty days," "is necessary, as the two requirements are cumulative so that *violation of either amounts to noncompliance*." *Hagenow*, 842 N.W.2d at 671 (internal quotation marks and citation omitted) (emphasis added). Furthermore, rule 1.508(3) expressly states:

> If the identity of an expert witness and the information described in rule 1.508(1)(a)(1) to (3) are not disclosed or supplemented in compliance with this rule, the court in its discretion may exclude or limit the testimony of such expert, *or make such orders in regard to the nondisclosure as are just.*

(Emphasis added.)

The Estate directs us to rule 1.517, entitled "Consequences of failure to make discovery," to support its argument that an order compelling discovery must be in existence before a court can impose the sanction of dismissal. The rule provides that a "party, upon reasonable notice to other parties . . . may move for an order compelling discovery," and the rule empowers the court to then enter an order compelling discovery if it sees fit. Iowa R. Civ. P. 1.517(1)(b). Additionally, the Estate is correct that subsection two of the rule expressly permits the court to impose sanctions if a party does not comply with its order to compel, including "dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party." Iowa R. Civ. P. 1.517(2)(b)(3). However, given the express language of rule 1.508(3) permitting the court to "make such orders in regard to the nondisclosure as are just," it is clear that the rules provide the district court authority to enter any order it deems

just, including dismissal, for a parties' failure to disclose or supplement as directed by rule 1.508.

Moreover, though not specifically expressed in our rules of civil procedure, a district court possesses an "inherent power . . . to maintain and regulate cases proceeding to final disposition within its jurisdiction," a principle recently reaffirmed by the supreme court. *Lawson v. Kurtzhals*, 792 N.W.2d 251, 258 (Iowa 2010) (internal citations and quotation marks omitted). Iowa case law has long recognized a court's authority to impose sanctions for a violation of the rules without a prior court order. *See, e.g.*, *Sullivan v. Chicago & Nw. Co.*, 326 N.W.2d 320, 324 (Iowa 1982) (acknowledging, in affirming imposition of sanctions for failure to timely supplement answers to interrogatories, the court's 1978 recognition that "violations of discovery rules alone may warrant sanctions"); *White*, 262 N.W.2d at 816 (holding, in affirming imposition of sanction for failure to timely supplement answer to interrogatory, that "trial courts have inherent power to enforce our discovery rules and have discretion to impose sanctions for a litigant's failure to obey them"); *see also* Iowa R. Civ. P. 1.508(3) (providing the court can "make such orders in regard to [a party's] nondisclosure as are just"); Iowa R. Civ. P. 1.517(4)(b) (providing that if a party fails to serve answers to interrogatories the court may make an order authorized by rule 1.517(2)(b)(2)); Iowa R. Civ. P. 1.517(2)(b)(2) (providing for an order "refusing to allow [a] party to support or oppose designated claims or defenses, or prohibiting such party from introducing designated matters in evidence"). Furthermore, the supreme court has approved the use of the district court's "inherent power to enforce our discovery rules" by imposing sanctions where a specific remedy for

noncompliance does not exist. *See Keefe v. Bernard*, 774 N.W.2d 663, 669 (Iowa 2009) (citing *White*, 262 N.W.2d at 816, which recognized our rules concerning the discovery of experts have "generally been construed to recognize" the power of the district court to impose sanctions even where no express power was conferred). We therefore reject the Estate's argument, as it ignores a long history of Iowa authority contrary to its position.

This inherent authority of the district court to impose sanctions for rule violations without there being an order violation makes sense, as illustrated by the unique facts of this case. Under our rules,

> parties seeking discovery should normally be justified in believing they have received substantially all the information requested. Our rules specifically require answers to interrogatories must be "fully" answered. Overall, our rules strive "to effectuate the disclosure of information relevant to the parties." Moreover, a party may not unilaterally determine the scope of the duty to respond to interrogatories. If [a party] want[s] to protect itself from a duty to supplement discovery, it should [move] for a protective order.

*Whitley*, 816 N.W.2d at 388 (internal citations omitted).

Here, the Estate answered and supplemented the defendants' interrogatories as if it produced all of the relevant documents in its possession, and it voiced no objection to the defendants' request for the test results. Dr. Jortani himself testified at his deposition, after many questions about D and L forms of methamphetamine, that he had requested but had not received the blood test results. Furthermore, the defendants explicitly requested from the Estate's counsel the test results on two occasions after the deposition, to which the Estate's counsel responded: "We have no report of the testing yet. We will check and see if Dr. Jortani has received any report yet." Having been misled as

to the existence of the blood testing results, there was nothing to alert defense counsel of a need to file a motion to compel. Given these undisputed facts, we reject the Estate's contention that

> because [it] had disclosed the fact that supplemental testing was being performed, [the d]efendants could have gone to the [district court] to secure an order to compel production of any written reports of the supplemental testing of either femoral blood or heart blood that [Dr. Jortani] received as soon *as he had received either of them*, *and the misunderstanding in the case could have been averted*.

(Emphasis added.) As one court aptly observed:

> A litigant will not be heard to contend that its own conduct has removed it beyond the reach of sanctions, when it has frustrated the orderly process prescribed in [the rules of civil procedure] by false or erroneous responses to interrogatories. To condone such conduct would force parties to assume the falsity of every sworn interrogatory response and file endless motions preserving their right to relief. Such a rule would allow the unscrupulous to conceal documents from opposing parties by the simple expedient of denying their existence, without fear of penalty if the deception were by some chance discovered. It would discourage diligence in seeking out relevant documents even on the part of those not actively dishonest. Lack of diligence or negligence would not only be unpunished, it would be rewarded.

*Orkin Exterminating Co. v. McIntosh*, 452 S.E.2d 159, 164 (Ga. Ct. App. 1994) (affirming sanction imposed upon Orkin in the absence of a motion or order to compel after Orkin provided a false interrogatory answer denying the existence of documents that later came to light); *see also Eaton Corp. v. Frisby*, 133 So. 3d 735, 752 (Miss. 2013) (quoting *Orkin* with approval and finding "no abuse of discretion in the trial court's decision to impose the monetary sanction issued in this instance, despite the absence of a motion to compel"). For these reasons, we find the district court unquestionably possessed the authority to impose

sanctions upon the Estate irrespective of whether there was an order compelling discovery in existence.

### B. Abuse of Discretion.

The real issue then is whether the court abused its discretion in imposing the harshest possible sanction upon the Estate—dismissal of its claims. The Estate maintains that even if the court had authority to impose sanctions under its inherent power, its decision to impose dismissal as the sanction was an abuse of its discretion under the facts of this case. We disagree.

In *Suckow v. Boone State Bank & Trust Co.*, 314 N.W.2d 421, 425-26 (Iowa 1982), the Iowa Supreme Court analyzed case law where a court's dismissal as a sanction was affirmed on appeal upon a finding of no abuse of discretion, and the case law where the dismissal was reversed for being too severe and therefore an abuse of discretion. The court summarized its findings, stating a "comparison of the two classes of cases . . . makes it clear that dismissal is a discovery sanction *generally used* when a party has violated a trial court's order" and that "[w]hen no trial court order has been disobeyed, a lesser sanction *may be indicated*." *Suckow*, 314 N.W.2d at 426 (emphasis added). The court had an opportunity at that time to foreclose forever a district court from imposing dismissal as a sanction where there was no violation of a court order, and it did not. Rather, the court's language in *Suckow* clearly left that option in play. *See id.* at 425-26. Although the *Suckow* court ultimately concluded that the district court abused its discretion in dismissing the Suckows' petition as a sanction because it was "too severe a sanction" "for willfully being absent from a single deposition," the court qualified its conclusion, basing its decision upon the

record before it and the specific facts of the case.  *Id.*  The cases following *Suckow*, though generally affirming dismissals where a court order was in existence, continued to reassert the language in *Suckow* contemplating that dismissal might be an appropriate sanction in some future case.  *See, e.g.*, *Lawson*, 792 N.W.2d at 259 ("Dismissal of the claim may also be available in some circumstances."); *Farley v. Ginther*, 450 N.W.2d 853, 856 (Iowa 1990) (stating the court is "less inclined to reverse a trial court's sanction when a violation of a previous order underpins that sanction"); *Munzenmaier v. City of Cedar Rapids*, 449 N.W.2d 369, 371 (Iowa 1989); *Krugman v. Palmer Coll. of Chiropractic*, 422 N.W.2d 470, 473 (Iowa 1988); *Postma v. Sioux Ctr. News*, 393 N.W.2d 314, 318 (Iowa 1986).  Consequently, the sanction of dismissal for a discovery violation, even in the absence of the violation of a court order, remains an arrow in that quiver of available remedies.

Finding dismissal to be a viable sanction option, we must then determine whether imposition of the sanction was an abuse of discretion.  On one hand, a "district court has wide discretion in its decision of whether, or which, discovery sanction to impose."  *See In re Marriage of Benson*, 695 N.W.2d 507 (Iowa Ct. App. 2005).  On the other, "[b]ecause the sanction[] of dismissal . . . preclude[s] a trial on the merits, the range of the trial court's discretion to impose such sanctions is narrow."  *Troendle v. Hanson*, 570 N.W.2d 753, 755 (Iowa 1997).  "This rule reflects the proper balance between the conflicting policies of the need to prevent delays and the sound public policy of deciding cases on their merits."  *Kendall/Hunt Publ'g. Co. v. Rowe*, 424 N.W.2d 235, 240 (Iowa 1988) (internal quotation marks and citation omitted).  With these concepts in mind, we cannot

"reverse the imposition of a sanction unless there has been an abuse of discretion," meaning the trial court's ruling "rest[ed] upon clearly untenable or unreasonable grounds." *Lawson*, 792 N.W.2d at 258.

The district court has a range of options available to it when choosing a sanction for a discovery violation. *Id.* In determining what, if any, sanction to impose, the court is to "consider the following factors:" (1) "the parties' reasons for not providing the challenged evidence during discovery," (2) "the importance of the evidence," (3) "the time needed for the other side to prepare to meet the evidence," and (4) "the propriety of granting a continuance." *Hagenow*, 842 N.W.2d at 672. On our appellate review, we review the district court's consideration of these factors to determine if there has been an abuse of discretion concerning the sanction imposed in light of these factors. *Id.*

It is true that dismissal is considered one of the harshest sanctions. *See, e.g.*, *Troendle*, 570 N.W.2d at 755; *Krugman*, 422 N.W.2d at 470; *see also Napreljac v. John Q. Hammons Hotels, Inc.*, 461 F. Supp. 2d 981, 1002-03 (S.D. Iowa 2006) ("Dismissal of an action, a particularly severe . . . or harsh sanction, . . . may be appropriate only after careful scrutiny of the record and a demonstration of truly dilatory and contumacious conduct, . . . because the opportunity to be heard is a litigant's most precious right and should be sparingly denied." (internal citations and quotation marks omitted.)). This harsh result can only be justified where the noncompliance with the rules was "the result of willfulness, fault, or bad faith." *Marovec v. PMX Indus.*, 693 N.W.2d 779, 786 (Iowa 2005); *In re Marriage of Williams*, 595 N.W.2d 126, 129 (Iowa 1999); *Munzenmaier* 449 N.W.2d at 371; *Kendall/Hunt*, 424 N.W.2d at 240; *Suckow*,

314 N.W.2d at 425.  The "willfulness, fault, or bad faith" need not be on the part of the client; it is well-established "that clients are responsible for the actions of their lawyers and in appropriate circumstances dismissal or default may be visited upon them because of the actions of their lawyers."  *Kendall/Hunt*, 424 N.W.2d at 241.

Considering all these factors, as well as the district court's explanation for imposing the dismissal over other, lesser sanctions, we cannot say that the district court abused its discretion under the unusual facts of this case.  Though the Estate asserts it did not violate any discovery rule and it "certainly" did not do so willfully, the facts plainly evidence otherwise.

Here, over two weeks into trial, a report surfaced that the Estate's counsel previously insinuated did not exist.  This report, while not confirming the substance found in Ludwick's blood was one-hundred percent illicit, street bought, or illegally manufactured methamphetamine, it determinatively ruled out the Vicks inhaler as an explanation for the methamphetamine's presence in his blood as suggested by the Estate prior to trial, as well as alluded to during trial testimony.  The Estate cannot claim the substance of Dr. Jortani's testimony did not change as a result of the test results, since Dr. Jortani testified at his deposition that those test results would form his opinion as to whether methamphetamine played a role in Ludwick's death.  Furthermore, the Estate's other witnesses at trial, including other expert witnesses, stated, or at least implied, that the methamphetamine present in Ludwick's blood could have been the result of a Vicks inhaler, which we now know is not the case.  Most importantly, it is clear the Estate knew that the evidence was material to the

defendants' defense. The Estate had a duty (1) to conduct discovery in good faith and to fairly address and meet the substance of the discovery requests of the opposing party, *see* Iowa R. Civ. P. 1.501(1) and (2) supplement its responses to the defendants' discovery requests concerning the test results "as soon as possible" after the defendants' January 2012 request and far in advance of trial. *See,* Iowa Rs. Civ. P. 1.503(4), .508(3); *see also Hagenow*, 842 N.W.2d at 671. There is no question these basic rules were violated by the Estate's counsel in this case.

The Estate has never explained its deception. While test results upon femoral blood may have been different than the results of the heart blood actually tested and counsel believed the testing was therefore not complete, this does not excuse the Estate counsels' duty to act in good faith and to supplement the responses to interrogatories and requests for production with regard to the testing actually done. There is no question in the record before us that the Estate's counsel knew of the existence of the heart blood test results, and no explanation is provided for the non-disclosure except that "there had been no formal specific request" for "specific heart blood test results." Aside from the previously filed discovery requests, the Estate had two very specific requests from the defendants for the results of the blood testing requested by Dr. Jortani. The defendants' request could not have been clearer. These requests were made weeks after Estate's counsel became aware of the test results. Even if the Estate's counsel truly believed they had no duty to provide the report to the defendants because of the belief the testing was not yet complete, it was for the court to decide, not the Estate, whether the information was discoverable, and it

was the Estate's duty to protect itself by moving for a protective order, not by deliberate deception.  *See Whitley*, 816 N.W.2d at 388.

During a colloquy between the district court and the Estate's counsel, the following transpired:

> THE COURT: . . . I think you said you are not denying that you knew there was a test done on the heart blood because you had a conversation [with co-counsel].  I think that's what you said.
> [THE ESTATE'S COUNSEL]: I don't deny that.
> THE COURT: I assume you made a conscious decision in response to that question not to tell [the defendants] about that test result.  Is that a fair statement?
> [THE ESTATE'S COUNSEL]: I think that's a fair statement.

We must conclude the Estate's withholding of the heart blood test results from the defendants was willful and deliberate, and its representation to defendants that it had no report results was misleading at best.

Although not as extreme, we find the facts of this case share some similarities with those in *Englebrick v. Worthington Industries, Inc.*, 944 F. Supp. 2d 899, 909-10 (C.D. Cal. 2013).  There, the plaintiffs brought a products liability action against the defendants, asserting "they suffered severe burns and other physical and emotional injuries after an allegedly defective [product] designed, manufactured, sold, and distributed by [the defendants] leaked gas and burst into flames."  *Englebrick*, 944 F. Supp. 2d at 901-02.  The defendants had "a very different theory" of the cause of the fire—the plaintiffs were actually using the defendants' product to smoke meth—and the defendants maintained this defense throughout the case.  *Id.* at 902-04.  Throughout discovery, the plaintiffs "repeatedly denied ever using the [product] to smoke meth and denied being under the influence of meth at the time of the fire."  *Id.*  Following more than four

years of litigation, trial commenced. *Id.* at 902. Two weeks into the trial, the plaintiffs revealed during cross-examination they had "repeatedly lied under oath during the entire pretrial process about their extensive meth use and addiction." *Id.* at 909. The defendants immediately requested the plaintiffs' case be dismissed based upon the plaintiffs' perjury, and the district court granted their motion to dismiss. *Id.* at 902, 907.

On appeal, the plaintiffs challenged the sanction of dismissal, and the federal appellate court affirmed. *See id.* The court explained the Ninth Circuit's requisite factors a court must consider

> in determining whether to exercise its inherent power to dismiss a case: (1) the existence of certain extraordinary circumstances, (2) the presence of willfulness, bad faith, or fault by the offending party, (3) the efficacy of lesser sanctions, (4) the relationship or nexus between the misconduct drawing the dismissal sanction and the matters in controversy in the case, and finally, as optional considerations where appropriate, (5) the prejudice to the party victim of the misconduct.

*Id.* at 908-09. Although the wording is different, the overall considerations are similar to those our supreme court has set out. *See Hagenow*, 842 N.W.2d at 672.

Ultimately, the appellate court found all of these factors strongly weighed in favor of dismissal. *Englebrick*, 944 F. Supp. 2d at 909. The court determined "[p]roviding false or incomplete information during a deposition or in a response to a discovery request constitutes the sort of willfulness, bad faith, or fault required for dismissal," and the plaintiffs' "deliberate deception" warranted dismissal. The court explained:

> [The plaintiffs] knew that [the defendants'] defense to their claims depended on [the defendants'] establishing their extensive meth

use and addiction. Yet [the plaintiffs] lied over and over again in deposition and discovery about their meth use and addiction. [The plaintiffs] never once made any effort to set the record straight. They never filed any corrections or changes to their deposition transcripts. They never filed any amended discovery responses. Instead, [the plaintiffs] let [the defendants] spend significant time and money litigating their lies during the entire pretrial process. It was not until two weeks into the trial that [the plaintiffs] disclosed their perjury. By that time, however, it was too late. [The defendants] already had invested the time and money needed to expose [the plaintiffs'] lies and destroy their credibility as witnesses.

*Id.*

We recognize the deception in this case is not near the level of deception in the *Englebrick* case. However, that there was deception at all is troubling. The Estate knew part of the defendants' defense was that illicit use of methamphetamine by Ludwick caused his death. By the time the test results came to light over two weeks into trial, the Estate had already put on extensive character testimony supporting its position that Ludwick was not an abuser of methamphetamine. Furthermore, the defendants were deprived of questioning the Estate's experts concerning the test results. Additionally, one of the Estate's experts implied that a Vicks inhaler could have caused the positive methamphetamine finding in Ludwick's blood without any correction by the Estate's counsel, who knew this was not a possibility given the test results. Moreover, the Estate had questioned and criticized the chief state medical examiner for not performing this test, when the Estate itself had knowledge of its own testing and its undisclosed unfavorable results.

Upon our thorough review of the record in this case, we find the district court considered all of the relevant factors to be considered in imposing the

dismissal sanction, and we cannot say that the dismissal was an abuse of its discretion.

### III. Conclusion.

Because we conclude the district court possessed the requisite authority to impose the sanction of dismissal under the facts of this case and it did not abuse its discretion, we affirm the district court's sanction.

**AFFIRMED.**

All judgest concur except Doyle, J., who dissents.

**DOYLE, J.** (dissenting)

I respectfully dissent. I agree with the majority that the district court had the authority to impose sanctions, including the sanction of dismissal. But under the circumstances presented here, I believe the imposition of dismissal—the ultimate penalty—was too severe.

Our supreme court has noted that "[t]he goal of modern discovery rules is to make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *Comes v. Microsoft Corp.*, 775 N.W.2d 302, 311 (Iowa 2009) (citation and internal quotation marks omitted). Further, "litigants are entitled to every person's evidence, and the law favors full access to relevant information." *Mediacom Iowa, L.L.C. v. Inc. City of Spencer*, 682 N.W.2d 62, 66 (Iowa 2004). In the end, as in all matters involving the search for the truth, evidence which leads to the truth should be and must be disclosed whether or not it is helpful or harmful to one party or another. The blood test results should have been seasonably disclosed to the defendants' counsel. They were not. Some sanction was therefore appropriate, but dismissal of the Estate's claims was not warranted.

No Iowa appellate court has affirmed dismissal of a party's claims as a discovery rule sanction in the absence of a violation of an existing order. Even in the face of a violation of a discovery order, "dismissal should be a rare judicial act." *Kendall/Hunt Publ'g. Co. v. Rowe*, 424 N.W.2d 235, 241 (Iowa 1988) (citations and internal quotation marks omitted). And, when no trial court order has been disobeyed, a sanction lesser than dismissal "may be indicated."

*Suckow v. Boone State Bank & Trust Co.*, 314 N.W.2d 421, 426 (Iowa 1982). No order was disobeyed here. Furthermore:

> When noncompliance is the result of dilatory conduct by counsel, the courts should investigate the attorney's responsibility as an officer of the court and, if appropriate, impose on the client sanctions less extreme than dismissal or default, unless it is shown that the client is deliberately or in bad faith failing to comply with the court's order.

*Kendall/Hunt*, 424 N.W.2d at 241 (citations and internal quotation marks omitted). There is not even an implication here that the Estate played any part in or had any knowledge of the nondisclosure of the blood test results. General principles cannot justify denial of the Estate's fair day in court except upon a showing of the sort of willfulness, bad faith, or fault required for dismissal. No such showing has been made here.

With the above in mind, I believe imposition of dismissal, the most severe and litigation-ending sanction, was not warranted. Our jurisprudence favors deciding disputes on the "merits rather than on procedural grounds." *McElroy v. State*, 637 N.W.2d 488, 498 (Iowa 2001). So it seems too extreme to slam shut the courthouse door to the Estate, a blameless litigant. A more moderate sanction is indicated. I would therefore reverse the trial court's imposition of dismissal as a sanction for the discovery rules violation and would remand to the district court for imposition of appropriate sanctions.

Since my opinion does not change the result of the majority's decision, I do not address the other issues raised by the Estate on appeal.